## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE INSURANCE COMPANY; AND UMR, INC.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>HOSPITAL PHYSICIAN SERVICES SOUTHEAST, P.C.; INPHYNET PRIMARY CARE PHYSICIANS SOUTHEAST, P.C.; AND REDMOND ANESTHESIA & PAIN TREATMENT, P.C.<br><br>　　　　Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.　　Plaintiffs United HealthCare Services, Inc.; UnitedHealthcare Insurance Company; and UMR, Inc. (collectively, "United") are leading healthcare and wellbeing companies, administering health care benefits for over 80 million people.  Over several decades, United has built the largest healthcare provider network in the United States and has received top reviews from third parties, including government agencies such as the Centers for Medicare and Medicaid Services and the Better Business Bureau.  United administers health care benefits for hundreds of employer-sponsored health plans in the State of Georgia alone.

2.      Defendants Hospital Physician Services Southeast P.C., InPhyNet Primary Care Physicians Southeast, P.C., and Redmond Anesthesia & Pain Treatment, P.C. (collectively, the "TeamHealth Defendants") are for-profit, private-equity backed healthcare staffing companies owned by Knoxville, Tennessee-based TeamHealth Holdings, Inc. ("TeamHealth").  TeamHealth is the largest physician staffing, billing, and collections company in the country.

3.      Over at least the last five years, the TeamHealth Defendants have rendered emergency and non-emergency medical services in Georgia to participants in and beneficiaries of certain employer-sponsored healthcare benefits plans whose benefits are administered by United (the "United Benefit Plans" or the "Plans").  The TeamHealth Defendants, however, are not contracted with United and, as such, they rendered these services as "out-of-network" providers.  Because the TeamHealth Defendants have no agreement with United to accept negotiated compensation amounts, they can and do charge their patients exorbitantly high amounts for their services.  These rates are, on average, multiple orders of magnitude higher than amounts accepted for the same or similar services by other similarly situated providers.  For example, many of the TeamHealth Defendants' charges are as much as 750% to 1,500% of the amount that providers participating in the Medicare program accept for the same services.

4.      Local hospitals such as Piedmont Augusta Hospital, Piedmont Walton Hospital, Doctors Hospital of Augusta, and others, have hired the TeamHealth Defendants to staff physicians and nurses into their facilities to provide medical care to patients.  But TeamHealth sets the TeamHealth Defendants' own billed charges for the out-of-network services that they render at those facilities; they consistently charge exorbitant rates in furtherance of TeamHealth's profit-maximization strategies.

5.      United, in its role as the claims administrator for the United Benefit Plans, is required to provide reimbursement for medical services in accordance with the Plans' terms.  In keeping with this obligation, United has reimbursed the TeamHealth Defendants for the covered medical services that they have provided at the rates or using the methodologies selected by the Plans.  In many instances, the Plans allow United to negotiate agreed reimbursement amounts for services with out-of-network providers and specify that the negotiated amounts constitute the Plans' authorized benefit levels.  Barring such agreements, however, the Plans state rates or methodologies for determining the Plans' benefit amounts for out-of-network services.  Where, as here, an out-of-network provider's billed charges are unreasonable,-these rates or methodologies may result in benefit payments that are less than the out-of-network provider's (inflated) billed charges.

6.     In rare cases, United has negotiated agreed reimbursement amounts with the TeamHealth Defendants for services provided on an out-of-network basis to participants in United Benefit Plans.  Most of the time, however, no agreement exists between United and the TeamHealth Defendants, and United must determine the reimbursement amount for claims for benefits for services provided by the TeamHealth Defendants based on the Plans' stated rates or methodologies.  This lawsuit concerns those claims for benefits only, and does not seek any relief with respect to claims for benefits for which the reimbursement amount is determined by an agreement with the TeamHealth Defendants.

7.     TeamHealth, the TeamHealth Defendants (who are owned by TeamHealth, whose billing and collection policies are set by TeamHealth subsidiaries, and who are subject to the direction of TeamHealth and its subsidiaries concerning whether, when, and how to file lawsuits demanding higher plan benefit payment amounts), and other TeamHealth affiliates collectively and individually contend that in the absence of an agreement with United on reimbursement amounts for out-of-network services to participants in the United Benefit Plans, they are entitled under state law to reimbursement in the amount of 100% of their unilaterally-set billed charges.  That is, they claim to have a right under state law not only to charge participants in United Benefit Plans whatever amounts TeamHealth, the TeamHealth Defendants, and other TeamHealth

affiliates want for covered emergency and non-emergency services, but also to receive payment from United (on behalf of the United Benefit Plans)—net of patient contributions through the co-payments, co-insurance, or deductibles required by their plans—based on the full amount billed to patients for such services even where that amount exceeds the benefit amount that is calculated in accordance with the rates or methodologies stated in the documents governing the Plans.

8.      This contention is foreclosed by ERISA.  The United Benefit Plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 to 1461, and ERISA requires benefits under ERISA-governed plans to be administered according to the plan terms. ERISA likewise makes clear that only federal law governs plan administration. ERISA not only provides an exclusive federal cause of action for plan participants and beneficiaries seeking benefits under the terms of an ERISA-governed plan, it also states that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a); *see generally* U.S. Const. art. VI, clause 2.

9.      Despite ERISA's command that benefits be administered exclusively in accordance with the terms of the United Benefit Plans, TeamHealth, the TeamHealth Defendants, and other TeamHealth affiliates nevertheless contend that

they are entitled under Georgia state law to recover their full billed charges in all instances where United has reimbursed them for out-of-network services to participants in the United Benefit Plans at any amounts less than their full billed charges. This is no idle threat—TeamHealth affiliates have invoked this same perceived entitlement to bring state law claims against United across the country. *See Atl. ER Physicians Team Pediatric Assocs., P.A. v. UnitedHealth Grp., Inc.*, 1:20-cv-20083, ECF No. 2 (D.N.J. Dec. 21, 2020); *Gulf-to-Bay Anesthesiology Assocs., LLC v. United Healthcare of Fla., Inc.*, No. 8:20-cv-02964, ECF No. 1-2 (M.D. Fla. Nov. 2, 2020); *Emergency Care Servs. Of Pa., P.C. v. UnitedHealth Group, Inc.*, No. 5:20-cv-5094, ECF No. 1-3 (E.D. Pa. Sept. 15, 2020); *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, No. 0:20-cv-60757, ECF No. 27 (S.D. Fla. June 9, 2020); *Fremont Emergency Servs. (Mandavia) Ltd. V. United Healthcare Ins. Co.*, No. 2:19-cv-00832, ECF No. 40 (D. Nev. Jan. 7, 2020); *Emergency Grp. Of Ariz. Pro. Corp. v. United Healthcare Inc.*, No. 2:19-cv-04687, ECF No. 18 (D. Ariz. Aug. 9, 2019); *Buffalo Emergency Assocs., LLP v. United UnitedHealth Grp., Inc.,* No. 1:19-cv-01148, ECF No. 1 (W.D.N.Y. Aug. 26, 2019); *Emergency Care Servs. Of Pa., P.C. v. UnitedHealth Grp., Inc.*, No. 1:19-cv-01195, ECF No. 1 (M.D. Pa. July 11, 2019); *Gulf-to-Bay Anesthesiology Assocs., LLC v. UnitedHealthcare of Fla., Inc.*, No. 17-CA-011207, Doc. 4 (Fla. Cir. Ct. Dec. 15, 2017).

10.    In these cases, the TeamHealth affiliates seek to recover their full billed charges from United where United has calculated different and lower benefit amounts in accordance with the rates and methodologies stated in the ERISA-governed United Benefits Plans.  These cases include claims that provisions or doctrines of state law other than contract principles—such as unjust enrichment, *quantum meruit*, state RICO laws, common law conversion, civil conspiracy, good faith and fair dealing, or consumer protection law—entitle the affiliates to payment at their full billed charges.  United refers to such claims hereafter as "Non-Contractual State Law Claims."

11.    United thus faces the choice of: (1) complying with its obligations under federal law (ERISA) to calculate benefits in accordance with the payment rates and methodologies that are adopted by and stated in the ERISA-governed United Benefit Plans when reimbursing the TeamHealth Defendants for out-of-network services (thus continuing to accrue claims from the TeamHealth Defendants that they are entitled to more), or (2) acquiescing in TeamHealth's contention that applicable state law requires United to reimburse claims from the TeamHealth Defendants at their full billed charges (thus violating ERISA by administering benefits under the United Benefits Plans other than in accordance with the terms of the plans).  As a claims administrator subject to ERISA, United needs to know whether, as it believes, it can and must apply the terms of the

United Benefit Plans concerning rates or methodologies for payment of claims for services delivered by out-of-network providers like the TeamHealth Defendants, notwithstanding the TeamHealth Defendants' contention that they are entitled to payment of their full billed charges pursuant to Non-Contractual State-Law Claims.

12.     United, therefore, seeks a declaratory judgment that ERISA preempts all Non-Contractual State Law Claims under Georgia law in connection with its reimbursement of the TeamHealth Defendants for their out-of-network services to participants in the United Benefit Plans.

## THE PARTIES

13.     Plaintiff United HealthCare Services, Inc. is a Minnesota corporation with its principal place of business in the State of Minnesota.

14.     Plaintiff UnitedHealthcare Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut.

15.     Plaintiff UMR, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Wausau, Wisconsin.

16.     Plaintiffs each administer health benefits under the United Benefit Plans.  The United Benefit Plans are employer- and employee-organization-

sponsored health benefit plans governed by ERISA that provide health coverage to millions of people in the United States, including individuals who work or reside in Georgia, as well other individuals, who have received or may receive services from the TeamHealth Defendants in Georgia.

17.     The TeamHealth Defendants are Hospital Physician Services Southeast P.C., InPhyNet Primary Care Physicians Southeast, P.C., and Redmond Anesthesia & Pain Treatment, P.C.

18.     Defendant Hospital Physician Services Southeast P.C. is a for-profit hospitalist medical care provider organized under the laws of the State of Georgia, with its principal place of business in the state in Thomastown, Georgia.

19.     Defendant InPhyNet Primary Care Physicians Southeast, P.C. is a for-profit emergency medical care provider organized under the laws of the State of Georgia, with its principal place of business in the state in Columbus, Georgia.

20.     Defendant Redmond Anesthesia & Pain Treatment, P.C. is a for-profit pain medicine and anesthesiology medical care provider organized under the laws of the State of Georgia, with its principal place of business in the state in Rome, Georgia.

21.     All TeamHealth Defendants are owned by or affiliated with TeamHealth, the largest for-profit physician staffing, billing, and collections company in the United States.  Specifically, TeamHealth acquires medical groups

or hires emergency room- and other hospital-based physicians—often as

independent contractors rather than employees—and then contracts with hospitals

to staff hospital operations with doctors and medical personnel under its control.

22.    TeamHealth, in turn, is owned by a private equity consortium backed

by the Blackstone Group, one of the largest asset managers and private equity

firms in the world.

## JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this dispute under 28

U.S.C. § 1332(a)(1) on the basis of diversity of citizenship because the controversy

is between citizens of different states and the amount in controversy against each

of the Team Health Defendants—the difference between (a) the billed charges

submitted by the TeamHealth Defendants for services deemed covered by United

(less the patient co-insurance amounts specified by the applicable Plans), and (b)

the amount that United has paid the TeamHealth Defendants for those services

pursuant to the rates or methodologies for reimbursing out-of-network providers

specified by the United Benefit Plans—exceeds the sum or value of $75,000,

exclusive of interest and costs.  *See infra* at ¶¶ 15–19, 48–49.

24.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and §

1391(d) because a substantial part of the events giving rise to the claims occurred

in this district, including but not limited to, the provision of medical services by the

TeamHealth Defendants on an out-of-network basis to participants and beneficiaries of the United Benefit Plans.

25.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because all of the Team Health Defendants are incorporated and have their headquarters, and thus reside, in Georgia, the State in which this Court is located.

26.     This Court has personal jurisdiction over the TeamHealth Defendants because the TeamHealth Defendants are incorporated in, have substantial contacts with, and regularly conduct business in Georgia.

## FACTUAL BACKGROUND

### A.     United Administers Claims Under Employee Benefits Plans Subject to ERISA

27.     The United Benefits Plans are employee health benefit plans sponsored by employers, labor unions, and other employee organizations, and are therefore governed by ERISA.  28 U.S.C. §§ 1002(1), (3), 1003(a).

28.     ERISA is the comprehensive federal statute governing employee benefit plans, including health plans.  ERISA plan sponsors establish written plan documents—essentially, "contracts"—governing the benefits they choose to offer employees.  *CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011).  ERISA does not "mandate what kind of benefits [to] provide."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).  Rather, it sets "'uniform standards'" for plan administration, and "'uniform … remedy[es]'" so that employees receive the

benefits their plans provide. *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). By "'assuring a predictable set of liabilities,'" ERISA "'induc[es] employers to offer benefits.'" *Id.*

29.     ERISA's "'linchpin'" is its "'focus on the written terms of the plan.'" *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). Employers retain "'leeway to design … plans as they see fit,'" and courts enforce plan provisions "'as written.'" *Id.*

30.     The United Benefit Plans include two types of plans. For "insured" plans, the employer pays a per-employee premium to United, and United assumes the financial risk of providing health coverage for insured events. For "self-funded" or "self-insured" plans, the plan sponsor pays a fee to United to build provider networks, maintain records, communicate with plan participants and beneficiaries, review claims, handle appeals, and provide other services, but the sponsor—not United—is ultimately financially responsible for paying benefit claims by plan participants and beneficiaries.

31.     All of the claims at issue in the Complaint correspond to various self-funded plans or to insured plans that offer general out-of-network benefits to plan participants and beneficiaries for non-emergency medical services. The Complaint does not seek a declaratory judgment or other relief with respect to insured plans that offer only in-network benefits for non-emergency medical services.

32.    Under the terms of the United Benefit Plans, United is responsible for determining benefit payments when a participant in one of the Plans obtains healthcare treatment that is covered by the terms of that plan (a "Covered Service").

33.    Each United Benefit Plan is subject to a governing plan document that serves to outline the benefits available to plan participants.  In the case of a plan for which United insures or underwrites benefits, the governing document is typically referred to as a "Certificate of Coverage" or "COC."  In the case of a self-funded plan, the governing document is typically referred to as a "Summary Plan Description" or "SPD."

34.    For the claims at issue, the applicable SPD or COC outlines which health care services are Covered Services.  In addition, the applicable SPD or COC states the rates or methodologies that are to be applied to calculate benefit amounts for Covered Services ("Allowed Amounts").  Typically, the rates or methodologies for determining plan benefits depend on whether the patient receives covered healthcare services from an "in-network" or "out-of-network" provider.

35.    The United Benefit Plans provide access to United's broad networks of physicians and hospitals where participants can receive high-quality care at affordable rates negotiated by United.  A contract between United and a provider for treatment of plan participants and beneficiaries is known as a "network

contract."  Healthcare providers who enter such agreements are known as "network" or "participating" providers, whereas those providers who do not enter into an agreement are "out-of-network" providers.  In general, the United Benefit Plans specify that where plan participants seek services from a network provider who has agreed in a network contract to specified amounts for Covered Services, the Plans' benefit or reimbursement amount is the amount specified for the Covered Services in the network contract.  The applicable SPD or COC specifies, in turn, what portion of this amount is payable by the United Benefit Plan, and what portion is the responsibility of the participant—e.g., in the form of a "co-payment" or "co-insurance."

36.     On the other hand, when a participant in a United Benefit Plan receives Covered Services from an out-of-network provider—a provider with whom United has no network contract—the lack of a contract by definition means that United has not previously agreed with the provider on a payment rate for treatment.  In such instances, the applicable SPD or COC states the rates or methodologies that are to be applied for determining the total benefit or reimbursement amount.  These rates or methodologies typically include, as a permitted reimbursement amount, any negotiated amount to which United and the out-of-network provider expressly agree to serve as full payment for the Covered Services.  But the applicable SPD or COC also states rates or methodologies to

apply in the absence of a negotiated agreement between United and the out-of-network provider.  ERISA requires United to reimburse the out-of-network provider according to the rates and methodologies stated in the United Benefit Plans, and not otherwise.  *See* 29 U.S.C. § 1104(a)(1)(D) (requiring plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan").

      **B.**    <u>**The United Benefit Plans Dictate the Rate of Reimbursement for Covered Services Obtained from Out-Of-Network Providers**</u>

37.    Out-of-network healthcare providers such as the TeamHealth Defendants are not parties to the United Benefit Plans for which United insures or administers benefits, and do not have contractual relationships with United.  When a participant in a United Benefit Plan obtains Covered Services from an out-of-network provider, the sole obligation of United is to pay by or on behalf of the participant the benefit amount for out-of-network services that is calculated in accordance with the rates or methodologies that are stated in the Plan's terms, thereby offsetting the participant's liability to the provider.  Because United and the out-of-network provider have no network contract limiting the amount that the provider will agree to accept for Covered Services, the participant remains financially responsible for paying the provider all amounts that exceed the Plan's prescribed out-of-network benefit amount.  United Benefit Plans typically explain that the patient will be responsible for the difference between the amount billed by

the out-of-network provider and the amount United determines to be the Allowed

Amount for reimbursement under the Plan.

38.     For example, one United Benefit Plan for which United has made

payments to TeamHealth Defendants on an out-of-network basis (hereafter referred

to as "Plan A") states: "For Non-Network Benefits, you are responsible for paying,

directly to the non-Network provider, any difference between the amount the

providers bills you and the amount UnitedHealthcare will pay for Eligible

Expenses.  Eligible Expenses are determined solely in accordance with

UnitedHealthcare's reimbursement policy guidelines, as described in the SPD."

Plan A at 82-83.  Another such United Benefit Plan for which United has made

payments to TeamHealth Defendants on an out-of-network basis (hereafter referred

to as "Plan B") similarly provides that "[i]f the PPO Plan covers a medical

expense, but the expense is provided by an out-of-network provider, that PPO Plan

typically will not have a discounted rate with the out-of-network provider.  This

means the out-of-network provider can bill you for any amount that the PPO Plan

does not cover.  For any medical expenses for goods and services that the PPO

Plan does not cover, you will be responsible for the cost of those services."  Plan B

at 23.

39.     In turn, the United Benefit Plans on behalf of which United has made

payments to TeamHealth Defendants for out-of-network services incorporate

Schedules of Benefits that state rates or methodologies that must be applied to

calculate the Plans' benefit amounts for such services.  For example, Plan B states

that for services that are determined to be covered by the Plan, an out-of-network

provider will be paid "based on the reasonable and customary rate ***and not the***

***amount charged by the provider***."  Plan B at 60-61 (emphasis added).  While the

Plan defines "reasonable and customary rates" according to multiple alternative

formulas, the Plan makes clear that the provider's billed charges are not one of the

options.  In particular, Plan B states that "reasonable and customary rates" are

based on "(1) the average amount that is being charged by medical providers in the

geographical area where the service was provided; (2) the most commonly charged

amount by medical providers in the geographical area for the service, and (3) the

amount that Medicare or another government plan would base its benefits upon."

*Id.*

40.    Other plans specify circumstances under which benefit amounts must

be paid according to a percentage of what Medicare pays for the services at issue.

For example, another plan (hereafter referred to as "Plan C") states the following:

> **For Non-Network Benefits (except the Standard Plan)**, Eligible Expenses
> are based on when Covered Health Services are received from a non-
> Network provider, Eligible Expenses are determined, based on negotiated
> rates agreed to by the non-Network provider and either UnitedHealthcare or
> one of UnitedHealthcare's vendors, affiliates or subcontractors, at
> UnitedHealthcare's discretion. If rates have not been negotiated:
> - Eligible Expenses are determined based on 110% of the published
>   rates allowed by the Centers for Medicare and Medicaid Services

(CMS) for Medicare for the same or similar service within the geographic market, with the exception of 50% of CMS for the same or similar laboratory service or 45% of CMS for the same or similar durable medical equipment, or CMS competitive bid rates.

- When a rate is not published by CMS for the service, UnitedHealthcare uses an available gap methodology to determine a rate for the service as follows:

  – For services other than Pharmaceutical Products, UnitedHealthcare uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale. The relative value scale is usually based on the difficulty, time, work, rise, and resources of the service. If the relative value scale(s) currently in use become no longer available, UnitedHealthcare will use a comparable scale(s). UnitedHealthcare and OptumInsight are related companies through common ownership by UnitedHealth Group. Refer to UnitedHealthcare's website at www.myuhc.com for more information regarding the vendor that provides the applicable gap fill relative value scale information.

  – For Pharmaceutical Products, UnitedHealthcare uses gap methodologies that are similar to the pricing methodology used by CMS, and produce fees based on published acquisition costs or average wholesale price for the pharmaceuticals. These methodologies are currently created by RJ Health Systems, Thomson Reuters (published in its Red Book), or UnitedHealthcare based on an internally developed pharmaceutical pricing resource.

  – When a rate is not published by CMS for the service and a gap methodology does not apply to the service, the Eligible Expense is based on 50% of the provider's billed charge.

- For Mental Health Services and Substance-Related  and Addictive Disorder services the Eligible Expense will be reduced by 25% for Covered Health Services provided by a psychologist and by 35% for Covered Health Services provided by a master's level counselor.

Plan C at 81-82.  Another such plan, which is sponsored by a leading Atlanta-

based employer (hereafter referred to as "Plan D"), states:

**Non-Network Benefits**

When you are enrolled in a network option and use doctors, hospitals and other medical providers who are not part of the UHC Choice Plus Network, or the UHC Options PPO Network if you are enrolled in PPO Option B or PPO Option B OOA, non-network benefits apply. Non-network benefits pay a lower amount of the provider's submitted charges and you will be required to pay more out of pocket in most cases. You may check a provider's status in your area by visiting myuhc.com or by calling the "For Members" number on the back of your ID card.

You are responsible for filing claims or seeing that claims have been filed by your provider. You also are responsible for calling for pre-approval of certain outpatient services, for hospital pre-approval and for continued stay approval when necessary.

In addition, you generally pay more for a medical service when using a Non-Network Provider because he or she has not joined the network and therefore has not agreed to accept contracted fees. You are responsible for any amount over the "Eligible Expenses," which are determined by the claims administrator.

Plan D further states:

If rates are not negotiated between UHC and the Non-Network Provider, then one of the following amounts is the Eligible Expense:

- Under the [] network medical options, the Eligible Expenses for non-network services and supplies are based on 140% of the Medicare-allowable charge (published rates allowed by the Centers for Medicare and Medicaid Services (CMS)) for the same or similar service or supply within the geographic market. This is referred to as the MNRP fee limit. MNRP applies to most non-network medical services and supplies including hospital, physician, radiology and medical supply expenses, and other non-network expenses for Covered Services. (Note: Certain services billed by a Network Provider (such as radiology and lab fees) are paid as network benefits; see "Allowed Amount" under the "Network Benefits- UHC Choice Plus" section above)

- If there is not an established Medicare-allowable charge, UHC uses an available "gap methodology" to determine a rate for the service as follows:

– For services other than Pharmaceutical Products*, UHC uses a gap methodology established by OptumInsight and/or a third party vendor that uses a relative value scale. The relative value scale is usually based on the difficulty, time, work, risk and resources of the service. Refer to UHC's website at myuhc.com for information regarding the vendor that provides the appliable relative value scale information

– For Pharmaceutical Products*, UHC uses gap methodologies that are similar to the pricing methodology used Medicare, and produces fees based on published acquisition costs or average wholesale price of pharmaceuticals. These methodologies are currently created by RJ Health Systems, Thomson Reuters (published in its Red Book), or UHC based on an internally developed pharmaceutical pricing resource

UHC typically updates the CMS published rates within 30 to 90 days after updated CMS data becomes available.

You, as the covered participant, are required to pay 100% of the amount billed to you by the provider that is in excess of the Eligible Expense, because that excess amount is not covered by the plan. Only the amount you pay that is determined to be an Eligible Expense will be applied to your Deductible. Any charges in excess of Eligible Expenses are not covered by the plan so they are not applied to you Deductible or Coinsurance amounts and, therefore, can result in much higher costs to you than you may have anticipated. You are responsible for paying, directly to the Non-Network Provider, any difference between the amount the Non-Network Provider bills you and the amount UHC pays for Eligible Expenses. The Plan will not pay excessive charges or amounts you are not legally obligated to pay.

Plan D at 90-91.

41.     The Schedules of Benefits in the United Benefit Plans further set forth the participant's financial responsibility for certain co-payments and deductible payments from out-of-network providers and warn insureds that "[i]f the PPO Plan covers a medical expense, but the expense is provided by an out-of-network provider, the PPO plan typically will not have a discounted rate with the out-of-

network provider.  This means the out-of-network provider can bill you for any amount that the PPO plan does not cover."  Plan B at 58.

**C.**   **United Pays Claims Submitted by The TeamHealth Defendants for Out-Of-Network Services to Participants in the United Benefit Plans According to the Applicable Summary Plan Descriptions and Certificates of Coverage for Those Plans**

42.     The TeamHealth Defendants are healthcare providers affiliated with or owned by TeamHealth, the largest physician staffing, billing, and collections company in the country.

43.     TeamHealth has negotiated with United on behalf of the TeamHealth Defendants and provided other support services, including handling billing and collection functions.

44.     United and two of the TeamHealth Defendants, Hospital Physician Services, Southeast, P.C., and Redmond Anesthesia & Pain Treatment, P.C., were previously parties to a network participation agreement (the "Participation Agreement").  However, on October 15, 2019, the parties terminated the Participation Agreement, and it has not been renewed, reinstated, or otherwise replaced.

45.     Since then, the TeamHealth Defendants have been and currently are "out-of-network" providers with respect to the United Benefit Plans, meaning that they do not have a contract of any kind with United that governs the

reimbursement of the services provided by the TeamHealth Defendants to participants in the United Benefit Plans.

46.    The dispute at issue here concerns the legally required rate of reimbursement when a participant or beneficiary in a United Benefit Plan receives Covered Services at one of the TeamHealth Defendants' facilities.

47.    Excluded from the dispute are out-of-network claims that are subject to the dispute-resolution provisions of the federal No Surprises Act ("NSA") (hereafter, "NSA Claims").  The NSA generally applies to claims for emergency services, and to claims for services delivered by out-of-network providers at network hospitals or other facilities, where the services were provided on or after January 1, 2022.

48.    Over the last five years, the TeamHealth Defendants have submitted to United millions of dollars in claims for Covered Services provided to participants in and beneficiaries of United Benefit Plans on an out-of-network basis, exclusive of NSA Claims.  This includes claims for emergency services and services delivered at network facilities before the NSA took effect on January 1, 2022, and claims for non-emergency services provided at out-of-network facilities both before and after January 1, 2022, which are not covered by the NSA.  Even after January 1, 2022, the TeamHealth Defendants have continued to provide hundreds of thousands of dollars in claims for Covered Services to participants in

United Benefit Plans on an out-of-network basis that are not subject to the NSA. The TeamHealth Defendants have sought payment of all of these claims at their full billed charges.

49.     Of the claims for Covered Services submitted by the TeamHealth Defendants over this five-year period on an out-of-network basis, exclusive of NSA Claims, United has determined that the amount allowed by the Plans in reimbursement for these out-of-network services was $2,128,092, and has made $1,597,816 in payments to the TeamHealth Defendants for these services after subtracting $530,277, the amount it determined was the co-insurance, co-payment, or deductible responsibility of the individual participants to whom the Covered Services were provided.  The TeamHealth Defendants' total billed charges for those claims, by contrast, were $7,097,988.  The precise amounts of billed charges submitted by each TeamHealth Defendant to United, and the amounts paid by United, are as follows:

| Provider | Charges | Allowed | Payments | Charges Less Allowed |
|---|---|---|---|---|
| Hospital Physician Services Southeast P.C. | $2,773,050 | $940,628 | $680,048 | $1,832,422 |
| InPhyNet Primary Care Physicians Southeast, P.C. | $3,040,680 | $1,001,420 | $769,313 | $2,039,260 |

| Redmond Anesthesia & Pain Treatment, P.C. | $1,284,258 | $186,044 | $148,455 | $1,098,215 |
|---|---|---|---|---|

50. Across all three TeamHealth Defendants, these payment amounts include $180,316 in allowed reimbursements for non-NSA claims for services rendered on or after January 1, 2022, for which United has made $77,131 in payments to the TeamHealth Defendants after subtracting $103,185 for individual participants' co-insurance, co-payment, or deductible responsibility. The TeamHealth Defendants' total billed charges for non-NSA claims for services rendered on or after January 1, 2022 were $664,637 or more than three-and-a-half times the total amounts that United allowed in accordance with the terms of the United Benefit Plans.

51. In determining the reimbursement amounts payable for services provided by the TeamHealth Defendants, United applied the applicable SPD or COC language stating the rate or methodology for computing out-of-network benefits. For instance, Defendant Redmond Anesthesia & Pain Treatment, P.C.'s billed charge for medical services that were rendered to a participant in a United Benefit Plan (hereafter referred to as "Plan E") was $2,074. The applicable COC language of Plan E required United to determine the payment for out-of-network services using the following alternative methodologies: "When Covered Health Services are received from an out-of-Network provider, Allowed Amounts are

determined, based on . . . Negotiated rates agreed to by the out-of-Network provider . . . If rates have not been negotiated . . . Allowed Amounts are determined based on 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market . . .”; or “For Covered Health Care Services received at a Network facility on a non-Emergency basis from an out-of-Network facility based Physician, the Allowed Amount is based on 110% of the published rates allowed by the *Centers for Medicare and Medicaid Services (CMS)* for the same or similar service within the geographic market . . . .”   United complied with this language by reimbursing the claim at a percentage of Medicare consistent with the plan document, and determined that the allowed amount for the claim was $147.75.  Defendant Redmond Anesthesia & Pain Treatment, P.C. asserts that Georgia common law entitles it to be paid $1,926.25 more for the benefit claim than Plan E actually allows, and to be paid a total amount for the claim that is more than 1,500% of the amount that providers participating in the Medicare program accept for the same services.

52.     While the TeamHealth Defendants have consistently demanded reimbursement from the United Benefit Plans at 100% of their billed charges, none of the applicable SPDs or COCs include language directing payment of claims for out-of-network services at 100% of the providers’ billed charges.

**D.**     **TeamHealth Disputes United's Payment Determinations as Part of Its Global Litigation Strategy**

53.     Despite United's payment of the TeamHealth Defendants' claims for services provided to participants or beneficiaries in the United Benefit Plans at the rates or in accordance with the methodologies selected by the Plans and which are stated in the applicable SPDs or COCs, the TeamHealth Defendants have declared United's determinations on these claims "disputed," and insist that they will remain so unless and until United reimburses the TeamHealth Defendants at 100% of the providers' billed charges—far in excess of the rate provided by any of the applicable SPDs or COCs.

54.     The position of the TeamHealth Defendants was crystalized and communicated, in part, in the context of litigation commenced by other TeamHealth-affiliated providers in jurisdictions outside Georgia.  In these proceedings, other TeamHealth-affiliated providers filed complaints asserting Non-Contractual State Law Claims (among others) and demanding pursuant to those claims that United reimburse them for their out-of-network services at 100% of the providers' charges, less any applicable patient co-insurance or co-payment amounts.  *See e.g., Atl. ER Physicians Team Pediatric Assocs., P.A. v. UnitedHealth Grp., Inc.*, 1:20-cv-20083, ECF No. 2 (D.N.J. Dec. 21, 2020); *Gulf-to-Bay Anesthesiology Assocs., LLC v. United Healthcare of Fla., Inc.*, No. 8:20-cv-02964, ECF No. 1-2 (M.D. Fla. Nov. 2, 2020); *Emergency Care Servs. of Pa.,*

*P.C. v. UnitedHealth Group, Inc.*, No. 5:20-cv-5094, ECF No. 1-3 (E.D. Pa. Sept. 15, 2020); *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, No. 0:20-cv-60757, ECF No. 27 (S.D. Fla. June 9, 2020); *Fremont Emergency Servs. (Mandavia) Ltd. v. United Healthcare Ins. Co.*, No. 2:19-cv-00832, ECF No. 40 (D. Nev. Jan. 7, 2020); *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare Inc.*, No. 2:19-cv-04687, ECF No. 18 (D. Ariz. Aug. 9, 2019); *Buffalo Emergency Assocs., LLP v. United UnitedHealth Grp., Inc.,* No. 1:19-cv-01148, ECF No. 1 (W.D.N.Y. Aug. 26, 2019); *Emergency Care Servs. of Pa., P.C. v. UnitedHealth Grp.*, *Inc.*, No. 1:19-cv-01195, ECF No. 1 (M.D. Pa. July 11, 2019); *Gulf-to-Bay Anesthesiology Assocs., LLC v. UnitedHealthcare of Fla., Inc.*, No. 17-CA-011207, Doc. 4 (Fla. Cir. Ct. Dec. 15, 2017).

55.     For example, in *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare Inc.*, TeamHealth-affiliated providers brought a state court action against United to recover 100% of their charges for out-of-network provider services, asserting causes of action (among others) for breach of the implied covenant of good faith and fair dealing, unjust enrichment, unfair competition, consumer fraud, and for a declaratory judgment under Arizona law.  No. 2:19-cv-04687, First Amended Complaint, ECF No. 18 (D. Ariz. Aug. 9, 2019).  Similarly, in *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, TeamHealth-affiliated providers brought claims against United for

reimbursement of their full charges, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), violations of Florida's deceptive and unfair trade practices act, unjust enrichment, and *quantum meruit*, among others. No. 0:20-cv-60757, ECF No. 27 (S.D. Fla. June 9, 2020).

56.     In the course of discovery in these commenced proceedings, TeamHealth officials have averred that TeamHealth-affiliated providers consider any claim submitted to United for Covered Services that was reimbursed at amounts less than 100% of their billed charges (less applicable patient co-insurance or co-payments) to be "disputed."  For example, in *Emergency Physician Services of New York, v. UnitedHealth Group, Inc.*, Paul Bevilacqua, TeamHealth's Vice President of Managed Care, testified that "it is a practice that whenever TeamHealth receives [] less than full billed charges on an out of network claim, they will always dispute it."

57.     As another example, in the same case, Kent Bristow, TeamHealth's Senior Vice President for Revenue Management, testified that TeamHealth's expectation is that they will be paid their "full billed charges" because they believe "our full billed charges are reasonable value."

58.     In proceedings commenced outside of Georgia, as noted, providers affiliated with TeamHealth have pleaded Non-Contractual State Law Claims in an effort to obtain a recovery from United of 100% of their billed charges for out-of-

network services.  Internal TeamHealth emails and documents produced in those

proceedings reveal that TeamHealth "has pursued litigation as a strategy" to

increase their profits.  And, in negotiations with United over reimbursement rates,

TeamHealth officials have threatened litigation against United and its employer-

clients to demand reimbursement at exorbitant levels—noting, for example, that

they have prepared to bring lawsuits in a number of states.

59.     Given TeamHealth's overarching legal strategy, if United continues to

pay the TeamHealth Defendants' claims for services provided to participants or

beneficiaries in the United Benefit Plans at the rates or according to the

methodologies specified in the applicable SPDs or COCs, United faces a

substantial, imminent risk that the TeamHealth Defendants will file additional

lawsuits and plead similar Non-Contractual State Law Claims in an effort to obtain

additional reimbursement from United with respect to those claims.

### E.     TeamHealth's State Law Claims Create Substantial Uncertainty and Risk for United and the Plans It Administers

60.     The uncertainty created by TeamHealth's Non-Contractual State Law

Claims creates an intolerable burden for United and the employer plan sponsors,

participants and beneficiaries it serves, with respect to both claims that United has

already processed and paid and claims that the TeamHealth Defendants are likely

to submit in the future.

61.     With respect to past claims, United and its employer plan sponsors require an accurate accounting of the reimbursement rates for services covered by the United Benefit Plans in order to make decisions about future coverage and budgeting on an ongoing basis.

62.     For insured plans, United uses data about expenditures under the United Benefit Plans to set the premiums that it charges plan sponsors and participants for coverage in subsequent years.  If TeamHealth is correct that United is required by state law to reimburse the TeamHealth Defendants' services at a different rate than the rate stated in the United Benefit Plans' COCs, United needs to know that as soon as possible so that it can take measures that may be necessary such as notifying any appropriate regulatory agencies, evaluating whether COCs need to be amended and re-filed with those agencies, and considering whether premiums should be adjusted (whether up or down).

63.     For self-funded plans, United's employer plan sponsors rely on data about prior expenditures to make decisions about what plan options to provide for their employees and what terms to include in those plans.  Further, because expenses under self-funded plans are ultimately borne by the employer plan sponsor, such plan sponsors need to know the expenses they have incurred in a particular year to make budgeting decisions affecting other aspects of their business.

64.     With respect to future claims, United needs certainty about the rates or methodologies it is required to apply when calculating benefits so it can accurately process claims on an ongoing basis.  In light of TeamHealth's threatened Non-Contractual Claims, United now faces the choice of (1) complying with its ERISA obligations to apply the rates and methodologies stated in the ERISA-governed United Benefit Plans when calculating benefits for out-of-network services provided by the TeamHealth Defendants (thus continuing to accrue claims from the TeamHealth Defendants that they are entitled to additional reimbursement), or (2) acquiescing in TeamHealth's contention that applicable state law requires United to reimburse claims from the TeamHealth Defendants at their full billed charges (thus violating ERISA by administering benefits under the United Benefits Plans other than in accordance with the terms of the plans).

65.     As a claims administrator subject to ERISA, United needs to know whether it can and must apply the terms of the United Benefit Plans concerning rates or methodologies for payment of claims for services delivered by out-of-network providers like the TeamHealth Defendants as it believes it is obliged to do under ERISA, notwithstanding the TeamHealth Defendants' contention that they are entitled to payment of their full billed charges pursuant to Non-Contractual State-Law Claims.

66.    Uncertainty about the correct reimbursement rate can result in under or overpayments borne by United (under insured plans), employer plan sponsors (under self-funded plans), and by plan participants and beneficiaries, whose co-payment, co-insurance, and deductible responsibility may depend on the reimbursement rates ultimately allowed by United.  If United approves excessive reimbursement rates to the TeamHealth Defendants based on their Non-Contractual State Law theories, the resulting overpayments by United, plan sponsors, and plan participants and beneficiaries may be difficult to recover after the fact.  Conversely, if the reimbursement rates allowed by United in accordance with plan terms are later determined in litigation to have been too low, it may be difficult for United to recoup any additional payments that are ordered to be made from the plan sponsors, participants, and beneficiaries at issue with respect to those claims.

67.    United therefore needs to know as soon as possible whether to continue to determine reimbursement rates to the TeamHealth Defendants under the terms of the United Benefit Plans, as it believes it is obliged to do under ERISA, or whether it must instead approve the TeamHealth Defendants' full billed charges based on the threatened Non-Contractual State Law Claims.

**F.**    **ERISA Preempts The TeamHealth Defendants' Non-Contractual State Law Claims**

68.    ERISA resolves any tension between the reimbursement rates dictated by the SPDs or COCs on the one hand, and those sought by the TeamHealth Defendants pursuant to the Non-Contractual State Law Claims, by preempting state-law rules for determining reimbursement under an ERISA plan to the extent that they conflict with plan terms.

69.    ERISA was created to provide a uniform regulatory scheme for employee benefit plans to ensure consistency and predictability for plan sponsors and their administrators, and for plan participants.

70.    This case concerns ERISA's express preemption provision, 29 U.S.C. § 1144(a) (Section 514(a) of ERISA).  That provision states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter *shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan* described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis supplied).

71.    Under this express preemption clause, ERISA supersedes any state-law claims that "relate to any employee benefit plan."  "A law 'relates to' an employee benefit plan," and is preempted, "if it has a [(1)] connection with or [(2)] reference to such a plan."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983).  A state law "has an impermissible 'connection with' ERISA plans" if it

"'governs . . . a central matter of plan administration,'" "'interferes with nationally uniform plan administration,'" or imposes "'acute, albeit indirect, economic effects'" that "'force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.'"  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016).

72.     The Non-Contractual State Law Claims have an impermissible "connection with" ERISA plans because they interfere with central aspects of plan design and administration, and in doing so affect the relationship between plans and the beneficiaries they serve.  The theory of the Non-Contractual State Law Claims is that United has an obligation to pay for Covered Services it rendered to participants in and beneficiaries of the United Benefit Plans at rates higher than the amounts allowed under the terms of the United Benefit Plans.  The Non-Contractual State Law Claims, if allowed, would negate those plan terms and affect the relationship between plans, participants, and beneficiaries by extending coverage beyond the terms of the plans.  The scope of coverage for healthcare services and rates of reimbursement are key terms of ERISA plans and are at the core of the relationship between plans, participants, and beneficiaries.  By modifying those key terms, the Non-Contractual State Law Claims would interfere with a central aspect of plan design.

73.    The Non-Contractual State Law Claims also would interfere with nationally uniform plan administration.  "ERISA's goal, [the Supreme] Court has emphasized, is 'uniform national treatment of [plan] benefits.'"  *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 17 (2004).  Allowing Georgia state law to dictate the design and administration of plans by modifying plan terms regarding the scope of coverage and the rate of reimbursement would subject ERISA plans to a thicket of conflicting state rules that will defeat Congress's objectives, preclude plans from offering uniform national coverage, and raise the costs of plan administration.  The resulting burden on plans will ultimately harm plan participants and beneficiaries by barring them from accessing the full range of benefits offered in other states, by increasing their cost-sharing obligations, and by "lead[ing] those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them."  *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987).

74.    The Non-Contractual State Law Claims therefore have an impermissible "connection with"—and thus impermissibly "relate to"—ERISA plans.  Those claims are accordingly preempted by ERISA § 514(a), 29 U.S.C. § 1144(a).

## COUNT I

### FOR DECLARATORY RELIEF
### UNDER 28 U.S.C. §§ 2201 AND 2202

75.     United repeats and realleges the allegations in paragraphs 1 through 73 as if set forth in full.

76.     Under the Declaratory Judgment Act, a federal court, "[i]n a case of actual controversy within its jurisdiction," is authorized, "upon the filing of an appropriate pleading," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §§ 2201–2202.

77.     This case presents an actual controversy.  The TeamHealth Defendants, through their affiliates, have declared that they are entitled under Georgia state law to recover their full billed charges in all instances where United has calculated allowed amounts for out-of-network services to participants in the United Benefit Plans at any amounts less than their full billed charges. TeamHealth affiliates have brought similar state-law claims against United across the country.  United, by contrast, maintains that it must apply the payment rates and methodologies stated in the ERISA-governed United Benefit Plans when reimbursing the TeamHealth Defendants for out-of-network services.

78.     As a claims administrator subject to ERISA, United needs immediate judicial resolution of this suit because uncertainty about the correct reimbursement

rate imposes a burden on United, and the employer plan sponsors, participants and beneficiaries it serves.  United needs to know whether it has accurately paid past claims submitted by the TeamHealth Defendants so it can provide an accurate accounting of expenditures for prior claims.  And United needs to know what methodology to use going forward to calculate benefits for future claims by the TeamHealth Defendants.

79.     Contrary to the contention of the TeamHealth Defendants and their affiliates that they are entitled to payment of their full billed charges, United can and must apply the terms of the United Benefit plans concerning rates or methodologies for payments of claims for services delivered by out-of-network providers like the TeamHealth Defendants.  *See* 29 U.S.C. § 1104(a)(1)(D) (requiring plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan").  United therefore respectfully seeks a declaration that the Non-Contractual State Law Claims that seek reimbursement in excess of amounts determined in accordance with the rates and methodologies stated in the United Benefit Plans for out-of-network services are preempted by ERISA, and pursuant to the Supremacy Clause of the United States Constitution, Article VI, Clause 2.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, for the foregoing reasons, United respectfully requests that the Court:

- Enter judgment in its favor declaring that all Non-Contractual State-Law Claims under Georgia law are preempted by ERISA and the Supremacy Clause of the United States Constitution, as they relate to requests by the TeamHealth Defendants for reimbursement of their claims for out-of-network services to participants and beneficiaries in the United Benefit Plans;

- Award United its attorneys' fees and costs under 29 U.S.C. § 1132(g)(1); and

- Grant any other equitable or remedial relief this Court finds appropriate.

Respectfully submitted,

Dated:  November 13, 2023

/s/ R. Blake Crohan

| | |
|---|---|
| Greg Jacob (*pro hac vice forthcoming*) | William H. Jordan |
| Meredith Garagiola (*pro hac vice forthcoming*) | (Georgia Bar No. 405112) |
| | R. Blake Crohan |
| 1625 Eye Street, N.W. | (Georgia Bar No. 512642) |
| Washington, D.C. 20006 | ALSTON & BIRD LLP |
| Tel.: (202) 383-5300 | One Atlantic Center |
| Fax: (202) 383-5414 | 1201 West Peachtree Street |
| gjacob@omm.com | Suite 4900 |
| mgaragiola@omm.com | Atlanta, GA 30309-3424 |
| | Tel.: (404) 881-7000 |
| | Fax: (404) 881 7777 |
| William D. Pollak (*pro hac vice forthcoming*) | bill.jordan@alston.com |
| O'MELVENY & MYERS LLP | blake.crohan@alston.com |
| 7 Times Square | |
| New York, NY 10036 | Emily Seymour Costin (*pro hac vice forthcoming*) |
| Tel.: (212)-326-2000 | ALSTON & BIRD LLP |
| Fax: (212)-326-2061 | The Atlantic Building |
| wpollak@omm.com | 950 F Street, NW |
| | Washington, DC 20004-1404 |
| | Tel.: (202) 239-3300 |
| | Fax: (202) 239-3333 |
| | emily.costin@alston.com |

*Attorneys for Plaintiffs United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and UMR, Inc.*